UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONNA M. OWENS,              )
                            )
            Plaintiff,       )
                            )
        vs.                  )        No. 4:06-CV-1535 (CEJ)
                            )
MICHAEL J. ASTRUE[1],        )
Commissioner of Social       )
Security,                    )
                            )
            Defendant.       )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

**I. Procedural History**

On November 30, 2004, plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq., and an application for supplemental security income disability benefits under Title XVI of the Act, 42 U.S.C. §§ 1391 et seq. (Tr. 33, 93). Plaintiff claimed disability due to arthritis, pain and limited mobility in the right ankle. (Tr. 172). Plaintiff alleged that her disability began on November 13, 2004. (Tr. 173). The applications were initially denied by defendant. (Tr. 66-70).

Plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on December 28, 2005. (Tr. 290). Plaintiff was not represented by counsel at the hearing. (Tr. 292-293).

_____

[1]Michael J. Astrue became the Commissioner of Social Security on January 20, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff testified in response to questions posed by the ALJ. (Tr. 290-306). There was no other testimony at the hearing. On May 16, 2006, the ALJ found that plaintiff was not disabled and denied her claims for benefits. (Tr. 10-20). Plaintiff requested review of the ALJ's decision by the Appeals Council. (Tr. 5). On September 8, 2006, the Appeals Council denied plaintiff's request. (Tr. 2). Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. <u>Evidence Before the ALJ</u>

At the time of the hearing, plaintiff was 46 years old. She had completed two years of college and, until November 2004, she went to school on a part-time basis to earn a degree in nursing. (Tr. 93, 296-297). Plaintiff also worked full-time as a developmental assistant at the Bellefontaine Habilitation Center. (Tr. 163, 297). She was responsible for eight mentally-ill patients in a single "house," assisting with their needs and ensuring that they received their medications. At times she was required to lift, with the help of one other person, patients weighing as much as 300 pounds. (Tr. 298). Occasionally, plaintiff was required to manage ten houses at the facility and supervise the work of 25 to 30 employees. Plaintiff worked at Bellefontaine from 1986 until December 2004, when she became unable to work because of her alleged disability. (Tr. 163, 296). Plaintiff has not worked since. (Tr. 163).

Plaintiff states that she can no longer work because of problems with her right ankle. (Tr. 299). After she was unable to continue working at Bellefontaine, plaintiff and one of her children began living with plaintiff's father. (Tr. 301-02). At the time of the hearing, plaintiff no longer drove because she did not own a vehicle. (Tr. 302).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff testified that she typically gets up at 6:30 in the morning and makes sure her fifteen-year-old son gets ready for school. (Tr. 302). She is able to groom and bathe herself; she prefers taking baths instead of showers because she can soak her leg in the tub. (Tr. 303). She usually eats a small breakfast and has take-out food or microwavable meals for lunch. (Tr. 302). Plaintiff testified that she had not been to a restaurant since her ankle surgery. (Tr. 304).

Plaintiff testified that she is able to make her bed, clean the tub after bathing, and fold laundry when it is brought to her. (Tr. 303). She is able to walk around the house, and tries to stay on her feet for at least two hours each day. (Tr. 304). When she goes grocery shopping she rides in a cart. (Tr. 303). She testified that she does not lift anything heavier than a gallon of milk. (Tr. 304). Plaintiff watches television during the day, but she testified that she can sit for only one hour at a time. (Tr. 304).

Plaintiff testified that she underwent two operations on her right ankle. (Tr. 300). In the first operation, pins and screws were placed in the ankle to provide support for a deteriorating bone. The second operation was performed to remove the devices. Plaintiff also had surgery on her left knee after she injured it in a fall down the stairs. (Tr. 300). All three operations were done in 2004. Plaintiff testified that she had not had any physical therapy. (Tr. 300). Plaintiff testified that her right ankle doesn't move, and that one of her legs is shorter than the other. (Tr. 300-01). Plaintiff testified that she

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

took Darvocet[2] twice a day for pain.  She had recently discontinued taking Vicodin[3] for pain because of its side effects.  (Tr. 301).

In a Function Report she completed on December 10, 2004, plaintiff wrote that she prepared two- or three-course meals for dinner twice or three times each week.  (Tr. 143).  While cooking, she would sometimes have to stop and sit down to rest her ankle.  (Tr. 143).

Plaintiff also reported that she was able to drive short distances and that she went shopping weekly or as needed.  (Tr. 144).  She stated that she enjoyed socializing and playing cards, darts or dominoes with friends.  (Tr. 145).  When asked to list the places she went to on a regular basis, plaintiff wrote that she attended church twice a month and that she went to the grocery three to four times a month.  Plaintiff reported that she enjoyed family gatherings, reading and watching movies.  (Tr. 145).

### III. Medical Records

On July 9, 2004, plaintiff was seen by David E. Karges, D.O., with complaints of pain and loss of motion in the right ankle.  (Tr. 193).  Plaintiff claimed that the pain worsened while walking or due to weather changes, and that it had significantly increased in the previous few months.  (Tr. 193).  Plaintiff reported that she had fractured her ankle in a motorcycle accident in 1978.  (Tr. 193).

Dr. Karges noted that plaintiff's right ankle joint had significant swelling with notable bony spurring.  (Tr. 193).  X-rays revealed severe

---

[2] Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain.  It can produce dependence.  See Phys. Desk Ref. 3497 (60th ed. 2006).

[3] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain.  Dependence or tolerance may occur.  See Phys. Desk. Ref. 530-31 (60th ed. 2006).

tibiotalar and talocalcaneal[4] arthritic changes with cyst formation and diffuse sclerosis[5]. (Tr. 194). Dr. Karges noted that plaintiff's osteoarthritis[6] was causing significant loss of range of motion. (Tr. 194). After discussing possible treatment plans, plaintiff decided she did not wish to pursue surgery at that time. (Tr. 194). She was worried that surgery would interfere with her nursing classes. (Tr. 194). Plaintiff was given a ASO-type lace-up brace to help ease the ankle pain while walking. (Tr. 194).

Plaintiff saw David L. Amarnek, D.P.M., on October 27, 2004. (Tr. 269). The medical records reveal that plaintiff was seeking a second opinion from Dr. Amarnek about the necessity of operating on her ankle. (Tr. 269). Plaintiff reported that she was experiencing "a lot of ankle pain" while walking and driving, and that the pain had progressively worsened. (Tr. 199, 269). Dr. Amarnek noted that plaintiff's right ankle condition was consistent with post traumatic degenerative changes following the fracture sustained in the 1978 motorcycle accident. (Tr. 269). Dr. Amarnek opined that plaintiff "probably has an avascular necrosis[7] involving the talus." (Tr. 269). Dr. Amarnek agreed that surgical intervention was warranted. (Tr. 269). Specifically, Dr.

---

[4]Talocalcaneal refers to the talus (ankle) and calcaneus (heel) bones. PDR Medical Dictionary 266, 1784 (2d. ed. 2000).

[5]Sclerosis refers to a hardening or induration of an organ or tissue, often due to excessive growth of fibrous tissue. PDR Medical Dictionary 1604 (2d. ed. 2000).

[6]Osteoarthritis is arthritis characterized by erosion of articular cartilage causing pain and loss of function. PDR Medical Dictionary 1282 (2d. ed. 2000).

[7]Pathologic death of cells, tissue or organ, due to deficient blood supply. Stedman's Med. Dict. 1184 (27th ed. 2000).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Amarnek believed that a tibial calcaneal fusion[8] should be performed. (Tr. 269).

A CT scan of plaintiff's right ankle on November 4, 2004 showed severe osteoarthritis involving the subtalar and ankle joints. (Tr. 108). The CT scan confirmed that large degenerative cysts and bony osteophytes[9] had formed throughout the subtalar and ankle joints. (Tr. 108).

Plaintiff was seen by Gregory R. Galakatos, M.D., on December 8, 2004. (Tr. 197). Plaintiff complained of pain on both the inner and outer portions of her right ankle. (Tr. 197). The physical examination revealed a normal alignment of plaintiff's ankle with no significant soft tissue swelling. (Tr. 196). Dr. Galakatos noted that plaintiff walked with a slight limp. (Tr. 196). Dr. Galakatos referred plaintiff back to Dr. Amarnek for further management. (Tr. 196).

On December 10, 2004, Dr. Amarnek wrote that plaintiff could not be on her feet. (Tr. 236). Dr. Amarnek noted that plaintiff continued to suffer severe pain and required the use of a walking device for mobility. (Tr. 236). Dr. Amarnek's statement indicates that plaintiff had been off work since November 12, 2004. (Tr. 236).

Dr. Amarnek requested a consultation with Gregory A. Kranzusch, D.P.M., regarding surgery on plaintiff's ankle. (Tr. 268). Plaintiff met with Dr. Kranzusch on December 16, 2004. (Tr. 268). The x-ray examination showed extensive narrowing of the ankle and subtalar joints and arthritic changes at both joint levels. (Tr. 268). Ankle and

_____

[8]A fusion is the joining together or union of bony parts. PDR Medical Dictionary 720 (2d. ed. 2000).

[9]An osteophyte refers to an area of bony outgrowth. PDR Medical Dictionary 1285 (2d. ed. 2000).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

subtalar joint arthrodesis[10] was going to be required. (Tr. 224). Dr. Kranzusch discussed the high rate of nonunion[11] associated with that particular type of surgery. (Tr. 268). To allow the best chance of union, both internal and external fixation[12], along with the use of a bone stimulator, would be required. (Tr. 267-68). Dr. Kranzusch stressed the importance of using the bone stimulator. (Tr. 224). Dr. Kranzusch also told plaintiff that she would have to stop smoking for a period of four to six weeks to help aid the bone fusion. (Tr. 267). Plaintiff acknowledged that she smoked one pack of cigarettes per day. (Tr. 268).

The surgery was scheduled for February 23, 2005. (Tr. 137). Arthrodesis of the ankle and talar joints was performed by Dr. Kranzusch, assisted by Dr. Amarnek. (Tr. 261-62). Dr. Kranzusch noted that the ankle joint was "extensively arthritic". (Tr. 261). There was also extensive arthritic changes with sclerosis on the talus. (Tr. 261-62). Dr. Kranzusch also applied an external multiplantar fixator. (Tr. 261-62).

Plaintiff presented to Dr. Kranzusch for a post-operative check-up on February 28, 2005. (Tr. 266). Plaintiff stated that she had experienced only minimal pain, which was controlled with oral pain medications. (Tr. 266). Plaintiff had no complaints of any

---

[10]Arthrodesis is the stiffening of a joint by operative means. PDR Medical Dictionary 149 (2d. ed. 2000).

[11]Nonunion is the failure of normal healing of a fractured bone. PDR Medical Dictionary 1227 (2d. ed. 2000).

[12]Fixation refers to the stabilization of bony parts through fixating to one another. External fixation is accomplished through the use of splints or transfixion pins while internal fixation involves screws, pins, rods, or plates. PDR Medical Dictionary 681-82 (2d. ed. 2000).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

complications. (Tr. 266). An examination of the ankle revealed that a large portion of the ankle joint was not clearly fused, although there could conceivably be some bone bridging. (Tr. 103). Plaintiff was told to continue her medications and keep her leg elevated. (Tr. 266). She remained non-weight bearing. (Tr. 266).

Plaintiff presented for a second post-operative visit on March 7, 2005. (Tr. 265). Plaintiff had no complaints at that time. (Tr. 265). She was using the bone stimulator as directed. (Tr. 265). No solid bony fusion was seen. (Tr. 106). She returned on March 14, 2005, complaining that the external fixator was becoming heavy. (Tr. 265). Otherwise, she had no complaints. (Tr. 265). Plaintiff remained non-weight bearing. (Tr. 265).

On her next visit on March 21, 2005, plaintiff reported that she was not experiencing pain. (Tr. 264). She remained non-weight bearing with a wheelchair. (Tr. 264). Dr. Kranzusch noted that the incisions were healing and the external fixator was intact with no compromise. (Tr. 264). In an insurance form dated March 25, 2005, Dr. Kranzusch noted that plaintiff remained restricted to non-weight bearing positions with her leg elevated. (Tr. 241).

X-rays dated March 28, 2005 revealed some flattening of the talus along with some sclerosis of it. (Tr. 105). There remained no definite sign of solid bony fusion. (Tr. 105). During a visit with Dr. Kranzusch on that same date, plaintiff stated that she was doing "very well". (Tr. 263). Plaintiff was then taking pain pills only at night. (Tr. 263). Plaintiff complained about the external fixator and asked Dr. Kranzusch if it could be removed. (Tr. 263). Dr. Kranzusch stated that the fixator was in excellent condition and discouraged its removal. (Tr. 263).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff presented to Dr. Kranzusch on April 4, 2005 with "no complaints". (Tr. 263). On April 18, 2005, plaintiff indicated that she was doing "very well", but was "very tired" of the external fixator. (Tr. 260). Plaintiff asked that it be removed. (Tr. 260). Dr. Kranzusch informed plaintiff that the application of the external fixator was necessary to facilitate the healing process. (Tr. 260). Plaintiff admitted that she had not been using the bone stimulator as directed. (Tr. 260). Dr. Kranzusch once again emphasized its importance to aid in bone fusion. (Tr. 260).

Plaintiff returned on May 2, 2005, and was again doing "very well". (Tr. 260). X-rays revealed bone consolidation along the ankle joint. (Tr. 260). Plaintiff was taking Vicodin each day and was also occasionally taking Valium to ease muscle spasms and uneasiness she was experiencing from the external fixator. (Tr. 260). Plaintiff reiterated her request to remove the fixator as soon as possible. (Tr. 260). Dr. Kranzusch convinced plaintiff to return in two weeks to examine whether the fixator should be removed. (Tr. 260).

Plaintiff met with Dr. Kranzusch on May 16, 2005. (Tr. 259). Plaintiff reported that she had fallen prior to the appointment, but she did not think she injured her ankle. (Tr. 259). Plaintiff admitted to Dr. Kranzusch that she had not been using the bone stimulator as she'd been instructed. (Tr. 259). Dr. Kranzusch again explained the importance of using the bone stimulator. (Tr. 259). Dr. Kranzusch described plaintiff as "partial weight-bearing with the crutches to tolerance." (Tr. 259).

X-rays taken on May 26, 2005 showed no new areas of bone destruction or erosion. (Tr. 270). Plaintiff stated that she was doing very well. (Tr. 259). She was using the bone stimulator more often.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(Tr. 259). Plaintiff reported that she had been driving with the external fixator. (Tr. 259). Dr. Kranzusch advised plaintiff that she cannot drive with the fixator. (Tr. 259). Dr. Kranzusch opined that the fixator should not yet be removed. (Tr. 259).

Plaintiff was seen by Dr. Kranzusch on June 9, 2005. (Tr. 258). X-rays revealed bone consolidation across the arthrodesis sites. (Tr. 258). Plaintiff stated that she was depressed over the continued immobilization of her foot. (Tr. 258). Plaintiff was eager to continue her classes and was upset because she'd thought that she'd be back on her feet by then. (Tr. 258). Dr. Kranzusch advised plaintiff that she was capable of returning to school at that time. (Tr. 258). Plaintiff decided to wait a few months. (Tr. 258). Plaintiff again requested removal of the external fixation device. (Tr. 258). Dr. Kranzusch told plaintiff that removal of the fixator could compromise the procedure. (Tr. 258). Plaintiff agreed to keep the fixator for an additional month. (Tr. 258).

On June 20, 2005, plaintiff returned and asked for the removal of the fixator. (Tr. 258). Although plaintiff acknowledged that there were no problems with the fixator, she complained that it was "driving her crazy". (Tr. 258). A second surgical procedure was scheduled for July 11, 2005, to remove the fixator. (Tr. 288). Plaintiff was advised that a period of non-weight bearing would likely follow the procedure. (Tr. 258).

The fixator was removed on July 11, 2005. (Tr. 257). The operative report notes that the positioning of plaintiff's ankle was satisfactory. (Tr. 257). No infection was present. (Tr. 257). Plaintiff was advised that she was again restricted to non-weight bearing positions. (Tr. 257).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff called Dr. Kranzusch's office on July 12, 2005, noting that she felt fine. (Tr. 121). On her next follow-up visit, on July 18, 2005, plaintiff stated that she was doing "very well". (Tr. 256). Plaintiff had not been utilizing the bone stimulator because she didn't like how it felt. (Tr. 256). An examination revealed that bone consolidation was present along the subtalar and ankle joints. (Tr. 256). Patient was partial weight-bearing with an air cast and crutches. (Tr. 256). Dr. Kranzusch emphasized the importance using the bone stimulator and that plaintiff stop smoking in order to aid in the healing process. (Tr. 256).

Plaintiff was doing well on August 1, 2005. (Tr. 256). She reported that she was walking without difficulty using the walker. (Tr. 256). There was no pain elicited during this visit. (Tr. 256). A radiological exam showed bone consolidation across the arthrodesis site. (Tr. 256). Dr. Kranzusch again advised plaintiff that she needed to continue using the bone stimulator to help avoid the risk of nonunion. (Tr. 256). Plaintiff admitted that she had not been using it. (Tr. 256). Plaintiff also acknowledged that she continued to smoke. (Tr. 256). When told that she needed to stop smoking to help bone union, plaintiff responded with a laugh. (Tr. 256). Dr. Kranzusch encouraged plaintiff to return to school, noting that her only limitations were that she be in a non-weight bearing position at that time. (Tr. 256).

In a letter dated August 3, 2005, Dr. Kranzusch explained that plaintiff would remain non-weight bearing through November 2005. (Tr. 288). This meant that plaintiff would not be able to perform any duties which involved placing weight on the recovering ankle. (Tr. 288). However, Dr. Kranzusch noted that plaintiff had no upper extremity

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

restrictions and that she could perform duties that would not involve standing, walking, lifting, or climbing. (Tr. 288). She could perform duties that would allow her to sit with her leg elevated. (Tr. 288).

On August 16, 2005, plaintiff fell down some stairs and injured her left knee. (Tr. 281). There was no fracture or dislocation of the knee. (Tr. 281). Soft tissue swelling with joint fluid was noted. (Tr. 281). Plaintiff was diagnosed as having a knee sprain and was given ibuprofen. (Tr. 276).

Plaintiff was seen on August 22, 2005 by Dr. Kranzusch. (Tr. 255). Plaintiff was doing better since her fall, but she continued to experience pain in her knee. (Tr. 255). Plaintiff reported that she had been using the bone stimulator but she had not quit smoking. (Tr. 255). She had stopped using the crutches a few days prior to this visit and was walking without the boot at times, without any difficulty. (Tr. 255). There was mild swelling of the right ankle, but plaintiff was able to put her foot on the ground without any complication. (Tr. 255). Plaintiff told Dr. Kranzusch that she had not yet returned to school. (Tr. 255). Dr. Kranzusch replied that plaintiff had no limitations as far as upper extremity work. (Tr. 255). Dr. Kranzusch also noted that, once she is ambulatory she could return to work in the boot if permitted by her employer. (Tr. 255).

On September 15, 2005, plaintiff stated that she was doing "very well". (Tr. 254). She had been walking without the walker using only a small ankle brace. (Tr. 254). Plaintiff stated that there was no pain at all. (Tr. 254). X-rays revealed bone consolidation across the lateral and central aspects of the ankle. (Tr. 254). The medial aspect

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

of the ankle demonstrated possible fibrosis.[13]  (Tr. 254).  The subtalar joint appeared to be consolidated.  (Tr. 254).  Dr. Kranzusch stated that a heel lift might be needed for plaintiff's shoe.  (Tr. 254).

Surgery on plaintiff's left knee was performed at DePaul Hospital on September 20, 2005.  (Tr. 284).  Plaintiff was required to keep her left leg elevated for twenty-four hours following surgery.  (Tr. 289).

Plaintiff returned to Dr. Kranzusch on October 3, 2005.  (Tr. 254).  Plaintiff stated that she had been walking in a tennis shoe with her ankle brace and was experiencing little-to-no discomfort.  (Tr. 254).  Plaintiff did state that she felt an imbalance while walking, but admitted that this was present even before her surgery.  (Tr. 254).  Dr. Kranzusch discussed the "excellent clinical findings" with plaintiff.  (Tr. 254).

Treatment notes from October 31, 2005, indicate that plaintiff had been wearing a hiking boot or tennis shoe since her last visit.  (Tr. 253).  Plaintiff had reduced her Vicodin intake and was experiencing mild hip pain.  (Tr. 253).  Plaintiff also still experienced some pain in the ankle when the weather changed.  (Tr. 253). Otherwise, plaintiff reported to be doing "very well".  (Tr. 253).  Dr. Kranzusch noted that there was an appreciable discrepancy in the lengths of her legs, causing a limp when plaintiff walked.  (Tr. 253).  Plaintiff was given a prescription for a 1 ½" external heel lift for her shoe.  (Tr. 253).  The lift would help patient eliminate her limp.  (Tr. 253).  Plaintiff was asked to follow up in six weeks but remained ambulatory to her tolerance.  (Tr. 253).

### IV.  The ALJ's Decision

---

[13]Fibrosis refers to the formation of fibrous tissue as a reparative process.  PDR Medical Dictionary 671 (2d. ed. 2000).

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

The ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.   The claimant has medically determinable "severe" impairments at the second step of the sequential evaluation process.

3.   The medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.   I find the claimant's allegations regarding her limitations are not credible for the reasons set forth in the body of the decision.

5.   I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments.

6.   The claimant retains the residual functional capacity to perform sedentary exertional work.  Sedentary exertional work requires a maximum lifting of 10 pounds; and, sitting for six out of eight hours per day.

7.   The claimant has past relevant work...as a developmental associate.  However, the claimant cannot perform her past relevant work.

8.   The claimant is a "younger individual."

9.   The claimant has a high school education, two years of college, and who is presently taking part-time classes for her degree as a registered nurse.

10.  The claimant has transferable skills from her supervisory role as a developmental associate as mentioned previously in this decision.

11.  The claimant has the residual functional capacity to perform a significant range [of] sedentary exertional work.

12.  Medical-Vocational Rule 201.29 directs a finding that the claimant is "not disabled" as defined in the Social Security Act.

13.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

## V.  Discussion

-14-

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u>, 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.   Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    the ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.    Plaintiff's Allegations of Error**

Plaintiff asserts that the ALJ failed to properly consider plaintiff's residual functional capacity. Specifically, plaintiff argues that the ALJ failed to properly consider the opinion of the treating physician in this matter. Plaintiff also contends that the ALJ failed to ensure that the record was fully and fairly developed.

Additionally, plaintiff argues that the ALJ failed to properly consider her subjective complaints. Finally, plaintiff contends that she suffers significant nonexertional impairments which require the testimony of a vocational expert. Because the ALJ should have secured the testimony of a vocational expert prior to finding that plaintiff is not disabled, plaintiff believes that the ALJ's decision is not based upon substantial evidence.

**1.  Residual Functional Capacity**

The Court will first examine plaintiff's argument that the ALJ's residual functional capacity ("RFC") assessment was erroneous. It is the duty of the ALJ to determine plaintiff's RFC after considering all relevant evidence. See Lauer v. Apfel, 245 F.3d 700, 703-704 (8th Cir. 2001). However, "[a] claimant's residual functional capacity is a medical question." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Thus, while the ALJ must consider all relevant evidence, at least "some

-17-

medical evidence" must support the residual functional conclusions of the ALJ. <u>See</u> <u>Lauer</u>, 245 F.3d at 704.

The ALJ found that plaintiff retained the residual functional capacity to perform sedentary exertional work which requires a maximum lifting of ten pounds and sitting for six out of eight hours per day. (Tr. 17). The ALJ noted that plaintiff was unable to perform her past relevant work, but found that plaintiff could perform other work existing in significant numbers in the national and regional economy. (Tr. 17). Accordingly, the ALJ found that plaintiff was not disabled. (Tr. 19).

Plaintiff believes that the ALJ, in making these findings, failed to properly consider the opinion of plaintiff's treating physician, Dr. Kranzusch. Plaintiff contends that the ALJ failed to account for Dr. Kranzusch's opinion that plaintiff could perform work in sedentary positions only so long as she could elevate her leg. Therefore, plaintiff argues that the ALJ's conclusion that plaintiff was capable of performing a full range of sedentary work activity is erroneous.

Defendant responds that the ALJ properly concluded that the restriction that plaintiff elevate her leg was a temporary post-surgery restriction. Defendant notes that subsequent medical notes from Dr. Kranzusch revealed no further restriction that plaintiff continue to elevate her leg.

On August 3, 2005, Dr. Kranzusch opined that plaintiff could "perform duties that would allow her to sit with the leg elevated." (Tr. 288). The ALJ found that this restriction was merely a temporary post-surgery restriction. (Tr. 15). The Court concludes that substantial evidence supports this finding. It is relevant that the record reveals only three occasions on which plaintiff was directed to

-18-

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

keep her leg elevated. (Tr. 241, 288, 289). The first instance was on March 21, 2005, approximately one month following plaintiff's first ankle surgery. (Tr. 241, 261-62). No further mention of this limitation was made until the August 3, 2005 letter from Dr. Kranzusch. This letter, however, was written less than a month following plaintiff's second ankle surgery. (Tr. 288). Finally, plaintiff was told to keep her leg elevated for a period of twenty-four hours on September 20, 2005. (Tr. 289). This limitation was part of the postoperative instructions given to plaintiff following surgery on her left knee. (Tr. 289). The fact that surgery preceded each instance where the limitation was imposed supports the ALJ's finding that the limitation was only a temporary post-surgical limitation.

Further, the ALJ properly considered that subsequent medical records failed to include this limitation. On August 22, 2005, medical notes from Dr. Kranzusch indicate that plaintiff was weight-bearing in the cam Walker. (Tr. 255). Dr. Kranzusch stated that plaintiff had "no limitations as far as upper extremity work", and noted that "once [plaintiff] is ambulatory fully in the cam Walker, she may return to work in the boot if permitted by her employer." (Tr. 255). Dr. Kranzusch does not mention any restriction that plaintiff elevate her leg at this time. (Tr. 255). Medical records from September and October 2005 show that plaintiff was ambulatory. (Tr. 253-54). Again, the notes are void of any limitation that plaintiff keep her leg elevated. (Tr. 253-54). There is simply no indication in the record that the limitation that plaintiff elevate her leg was anything more than a temporary restriction imposed following surgery. For these reasons, the Court concludes that substantial evidence supports the ALJ's finding that "the expressed limitations by Dr. Kranzusch, such as

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

that [plaintiff] elevate her leg, are now antiquated and void." (Tr. 15).

Plaintiff next contends that the ALJ failed to develop a full and fair record. Plaintiff argues that the ALJ should have recontacted the examining and treating physicians for additional clarification of the record. An ALJ is "not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). The ALJ does not indicate that any issue was left untouched by the physicians' notes. The ALJ simply discounted the limitation that plaintiff elevate her leg because substantial evidence showed that it was no longer relevant. There was no crucial issue left undeveloped. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Thus, the Court finds that the ALJ did not have a duty to recontact Dr. Kranzusch, or any other physician, relating to this matter.

The Court concludes that substantial evidence supports the ALJ's determination of plaintiff's residual functional capacity. There was no error in the ALJ's finding that plaintiff is no longer required to elevate her leg and the record was fairly and fully developed.

## 2. Credibility Determination

Plaintiff contends that the ALJ failed to properly consider plaintiff's subjective complaints. The ALJ found that plaintiff was not fully credible and cited the familiar Polaski factors. (Tr. 16); see Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Under Polaski, when assessing whether a claimant's subjective complaints are credible, the ALJ must consider all of the evidence, including claimant's work history and observations regarding: (1) claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) the dosage,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

effectiveness and side effects of medication; (4) any precipitating and aggravating factors; and (5) claimant's functional restrictions. " Polaski, 739 F.2d at 1321. The ALJ is not required to discuss each Polaski consideration, so long as its considerations were acknowledged and examined prior to discounting the claimant's subjective complaints. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).

Under the first Polaski consideration, the ALJ noted that, although plaintiff claims that she cannot perform even sedentary work, she was pursuing a nursing degree which indicated that she believed she would be capable of performing such medium exertional work. (Tr. 16-17). The ALJ also cited several activities of daily living which contradicted plaintiff's allegations of disability. (Tr. 17). Specifically, the ALJ considered that plaintiff regularly assisted in getting her teenage son to school while also cooking, cleaning, doing laundry and going shopping on an occasional basis. (Tr. 17). The ALJ also considered plaintiff's attendance at family functions. The ALJ believed that these activities exceeded that which would ordinarily be expected given plaintiff's complaints of disabling symptoms. (Tr. 17).

"[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995). The Court's review of the record shows that, while plaintiff is able to engage in modest activities of daily living, plaintiff consistently states that she does so only occasionally. She stated that she did laundry once a week. (Tr. 141). While she does go shopping, she often goes with the assistance of a family member. (Tr. 142). Additionally, while grocery shopping she does not lift anything heavier than a gallon of milk. (Tr. 304).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Although she does cook, she acknowledges that it takes her a lot longer because of her discomfort. (Tr. 143). The Court is not convinced that these activities of daily living alone are clearly inconsistent with plaintiff's allegations of disability. The Court agrees, however, that plaintiff's continued intention to return to nursing school might detract from her credibility to some extent, as it indicates that plaintiff subjectively believed she would be capable of performing such work.

The second <u>Polaski</u> consideration examines the duration, frequency, and intensity of the pain. The medical notes indicate that plaintiff's complaints of pain were limited following her surgeries. Plaintiff was doing "very well" and was without pain on August 1, 2005. (Tr. 256). On September 15, 2005, plaintiff reported no pain when walking around the house. (Tr. 254). On October 3, 2005, plaintiff was walking with little or no discomfort. (Tr. 254). On October 31, 2005, plaintiff complained only of minor hip pain and stated that she could feel her ankle "drop" when the weather changed. (Tr. 253). Indeed, the medical records indicate that the surgeries were successful and plaintiff was recovering well. It is notable that plaintiff did not have any physical therapy for her ankle. (Tr. 300). The second <u>Polaski</u> consideration strongly detracts from any allegations of continued severe pain or discomfort.

The ALJ also considered that plaintiff continued to smoke and failed to regularly use the bone stimulator as directed. The failure to comply with prescribed treatment is a proper credibility factor. <u>See Eichelberger v. Barnhart</u>, 390 F.3d 584, 590 (8th Cir. 2004); <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 (8th Cir. 2000)(failure to quit smoking was relevant factor). However, an unwillingness to follow treatment that

has only a "speculative expectation of medical improvement....is neither a valid reason for disallowing benefits nor for discrediting a claimant's testimony." <u>Kirby v. Sullivan</u>, 923 F.2d 1323, 1329 n.2 (8th Cir. 1991).

Plaintiff was repeatedly told by Dr. Kranzusch that she needed to use the bone stimulator and stop smoking to aid in bone consolidation. (Tr. 255, 256, 258, 259, 260). Plaintiff was reminded that the success of her recovery could be negatively impacted if she continued to smoke or failed to use the bone stimulator. (Tr. 256). On August 1, 2005, Dr. Kranzusch discussed with plaintiff the likelihood of delayed or non-union was "significantly higher if she does not utilize the bone stimulator and continues to smoke." (Tr. 256). Plaintiff stated that she understood, but laughed when Dr. Kranzusch reminded her of the importance of quitting smoking. (Tr. 256). While plaintiff did eventually begin to use the bone stimulator, although not as often as directed, she did not quit smoking. The failure to follow Dr. Kranzusch's prescribed treatment is a relevant consideration. The medical notes indicate that, by quitting smoking and using the bone stimulator, there was a significantly higher expectation of medical improvement.

The ALJ also found that plaintiff's application for and receipt of unemployment compensation indicated that plaintiff believed she was capable of work. (Tr. 17). Plaintiff contends that this finding is factually inaccurate, as plaintiff testified at the ALJ hearing that she had not received unemployment compensation. (Tr. 296). Defendant admits that plaintiff did not receive unemployment benefits. Further, the record is unclear as to whether plaintiff did indeed represent herself as willing and able to work in her unemployment application.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Thus, it was improper for the ALJ to consider plaintiff's unemployment application in making a determination regarding plaintiff's credibility.

Defendant contends that this was a harmless error, arguing that the ALJ's credibility determination is supported by other substantial evidence. Upon reviewing the entire record, the Court agrees. The substantial evidence throughout the record is inconsistent with plaintiff's subjective claims of a disabling condition.

### 3. Vocational Expert Testimony

Plaintiff's final argument is that the ALJ was required to obtain the testimony of a vocational expert because a non-exertional impairment is present. Plaintiff contends that the necessity that plaintiff elevate her leg constitutes a non-exertional impairment, thus requiring the testimony of a vocational expert prior to a finding that plaintiff could perform a full range of sedentary work activity. Because the requirement that plaintiff elevate her leg was properly found by the ALJ to be a temporary restriction, it does not constitute a non-exertional impairment.

Plaintiff also contends that a vocational expert was necessary because pain is a non-exertional impairment. As noted above, any allegations of disabling pain are clearly inconsistent with the substantial evidence in the record. When "allegations of pain are appropriately discredited for legally sufficient reasons, such as inconsistencies in the record evidence, the ALJ may employ the guidelines to direct a determination of not-disabled." <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991). The ALJ was not required to obtain the testimony of a vocational expert. Instead, it was appropriate for the ALJ to use Medical-Vocational Rule 201.29, Table No.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

2, Appendix 1, Subpart P of Regulation No.4, to direct a finding that plaintiff is not disabled.

Substantial evidence supports the finding that plaintiff can perform other work that exists in significant numbers in the national economy. Therefore, plaintiff is not disabled within the meaning of the Social Security Act and Regulations. See 20 CFR 404.1520(f) and 416.920(f).

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her complaint [#1] and her brief in support of complaint is **denied.**


_____
CAROL E. JACKSON
UNITED STATES DISTRICT COURT


Dated this 25th day of February, 2008.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com